Kent E. COUCH
and Susan M. Couch,
*Plaintiffs,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant.*

(TC 4511)

Trial was held June 26, 2001, in the courtroom of the Oregon Tax Court, Salem.

Joseph Wetzel, Wetzel DeFrang & Sandor, Portland, argued the cause for Plaintiffs (taxpayers).

James C. Wallace, Assistant Attorney General, Department of Justice, Salem, argued the cause for Defendant (the department).

Decision for Defendant rendered October 4, 2001.

## CARL N. BYERS, Senior Judge.

Plaintiffs (taxpayers) appeal from an assessment of additional income tax and penalties for 1997. The assessment was based on certain incentive payments received by taxpayers to rebrand a gas station. The magistrate ruled that the incentive payment constituted taxable income and was taxable as such in 1997. Taxpayers appealed, and the court conducted a trial *de novo*.

## FACTS

Taxpayer Kent Couch (Couch) was the principal owner of Couch Investments, LLC, a one person limited liability company. Couch agreed to purchase a gas station and convenience store business. The business assets consisted of inventory and merchandise; equipment, leases, distributor contracts; fixtures; goodwill; and a noncompetition agreement. Couch agreed to pay $728,000 with a $300,000 down payment. Couch did not have enough money for the down payment. However, he learned from Pioneer Energy Company, a Jobber for Shell Oil Company (Shell), that Shell would provide the necessary funds if Couch were willing to rebrand the station as a Shell station. Shell had previously withdrawn from the retail market in Oregon and was extremely anxious to re-establish retail outlets.

By letter agreement dated September 1, 1997, between the Jobber, Couch, and Shell, Shell agreed to provide incentive payments to allow Couch to purchase the station. The agreement provides, in part:

> "* * * Buyer shall earn an acquisition incentive payment equivalent to the rate of three (3) cents for each gallon of Products delivered to the Station for a period of thirty-six months[.] * * * [B]ased upon Buyer's projection that the volume of Products delivered to the Station will be **210,000** gallons per month * * * [Shell] agrees to advance the sum of **$192,780.00.**"[1]

---

[1] Two hundred ten thousand gallons per month times 36 months, times 3 cents per gallon equals $226,800. Apparently, the difference between that amount and the $192,780 agreed to be advanced by Shell is a result of discounting $226,800 to its present value.

The agreement provides that if the projected gallonage exceeds the actual gallons sold, at the end of 36 months, the buyer agrees to repay the incentive at the same rate. Also, if Couch ceases to operate the station as a Shell station anytime before the end of the 10-year period, the entire $192,780 must be repaid. With this additional funding available, Couch entered into an agreement to purchase the station and cause it to be rebranded. Of the $192,780,[2] $28,000 was paid directly to other parties and $165,000 was deposited in the escrow credited to Couch's account and applied against the purchase price.

## ISSUE

Is the incentive payment taxable income to Couch in 1997?

## ANALYSIS

■■  What constitutes taxable income is governed by federal law. ORS 316.047.[3] Internal Revenue Code (IRC), section 61(a) defines gross income to include "all income from whatever source derived." Of course what constitutes "income" is another question. Neither bonafide loans nor a return of capital is income. Other amounts may be potential income but are not recognized until they are "realized," such as unrealized appreciation or deferred compensation. Still other amounts or benefits may be actually received but are not recognizable because they are subject to restrictions or contingencies such as certain stock options or the right to contract payments. *See* Jacob Mertens, Jr., 1-2 *Mertens Law of Federal Income Taxation*, §§ 5.05, 5.11, and 10.08 (rev 2000).

Here, it is clear that the $193,000 was not a loan. Although a Promissory Note was executed, by its terms it became void upon rebranding of the station. Rebranding of the station occurred in 1997.[4] Therefore, taxpayers were not

---

[2] The total amount paid was actually $193,000.

[3] All references to the Oregon Revised Statutes are to 1997.

[4] There is no specific date mentioned for completion of rebranding of the station. However, Couch claimed a deduction for an amount owing to Shell because he did not sell as much gasoline in 1997 as projected. Therefore, in order to be selling Shell products, Couch must have completed the rebranding in 1997.

obligated to repay the incentive payment unless it failed to comply with other conditions of the incentive agreement.

It is also clear that $193,000 was realized and received. If that amount had not been paid, the transaction whereby Couch purchased the business would not have closed. In fact, checks were written, cashed, and Couch became the owner of the business. Shell has no ownership interest in the business. Couch's liability for that amount, if he fails to meet the conditions, is not even secured by a lien or other security agreement. It is a naked, personal obligation.

Couch contends that the restrictions or conditions are such as to avoid recognition of payment in 1997. However, the nature of the conditions focuses on the post-receipt potential. That is, if the number of gallons actually sold is less than the gallons projected, Couch is obligated to repay Shell for the difference at the rate of 3 cents per gallon. However, Couch's obligation does not mature or ripen until the end of 36 months. Moreover, the measure is on the total for the 36-month period. That is, while there may be a deficit during the early years, if Couch sells more gallons than projected in the later years, he can make up the difference and there may be no deficit. Couch would only know whether there is a deficit after the last day of the 36-month period.

Similarly, if the station does not retain the Shell brand for the full 10-year period, the full amount of the incentive must be repaid. However, if Couch or his successors-in-interest maintain the Shell brand for 10 years, no amount will have to be repaid. Whether any amount will have to be repaid or not will not be known for at least 10 years. Under those conditions, Couch must recognize the income when received.

The fact situation here is similar to that in *John B. White, Inc. v. Comm.*, 55 TC 729 (1971). There, Ford Motor Company paid an automobile dealer $59,290 as an incentive payment to move the dealership to a more favorable location. There, the Tax Court held that the incentive payment was taxable income to the dealer. Ford did not have an ownership interest in the dealership property and made the incentive payment solely in consideration of the potential for increased sales of Ford products. Here, Shell has no ownership interest

in Couch's gas station and made the incentive payment in anticipation of increased sales of its petroleum products.

■     The Internal Revenue System's (IRS) position is consistent with the case law. Publication 3106 (5-98) entitled "Overview of Imagining Reimbursement Program for Gasoline Station Owners" specifically addresses incentive payments to gasoline station owners. That publication states:

> "Generally, a gasoline station owner should include the payments received fully in gross income in the taxable year received."

Likewise, Revenue Procedure 71-21 recites the general rule that "payments received for services to be performed in the future must be included in income in the year received." Couch contends that he never received or controlled the funds. However, it is clear that all of the amounts were credited to Couch's account toward the purchase of the business assets. Without those amounts being credited toward his benefit, there would have been no sale transaction. Therefore, Couch not only received the benefit of the payments but by virtue of controlling the sale transaction, he controlled the disbursement of the funds.

Couch also argues there was no benefit to him because the goodwill was grossly overpriced and therefore the only benefit was to Shell. Taxpayer argues that the court should apply economic analysis of the facts to find that Couch received no benefit.

The court agrees that it appears the assets were overpriced. Couch admitted that he had no training, schooling, or experience in bookkeeping, accounting, tax preparation, or business administration. Consequently, he was like a lamb being led to the slaughter. The fact that the tax man is one of those in line demanding a pound of flesh does not excuse taxpayer from his error in judgment.

■     From an economic point of view, Shell did not benefit directly from the transaction. Shell disbursed $193,000 in anticipation of increased product sales. However, Shell did not receive any ownership interest in the gas station. Shell does not control ownership or operation of the gas station. Couch could change the brand of the station tomorrow, if he

determined that it was to his benefit to do so. He might do so if he found another gasoline company that would be willing to pay the cost of rebranding, including paying Shell the $193,000 that would be owing. There was evidence that this kind of change takes place regularly within the industry.

From an economic point of view, the only difference between Couch borrowing the money from Shell or from a bank is that he would be unconditionally obligated to repay the bank. Therefore the amount from the bank would be a loan and not income. Couch is not unconditionally obligated to repay Shell and may never have to repay Shell the amount involved. Therefore, the amount involved must be taken into income in the year received.

The department requests the court to also disallow the amount of $10,200 deducted by taxpayers on their 1997 amended tax return as an amount to "repay Shell income." Based on the evidence, the court finds the amount of $10,200 was neither repaid nor was Couch obligated to pay any such amount. As noted, Couch's obligation to repay any amount could only be determined at the conclusion of the 36-month period. Therefore, taxpayers' 1997 deductible business expenses on Schedule C must be decreased by $10,200.

Judgment will be entered consistent with this Opinion.